Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
       doug@lozeaudrury.com

Andrew L. Packard (State Bar No. 168690)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

ORIGINAL FILED

APR 2 2 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | Case No. C09-01757 PJH |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| vs. | |
| REPUBLIC SERVICES, INC, a corporation. | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendant. | |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

## I.     INTRODUCTION

1.     This complaint seeks relief for Defendant's discharges of polluted storm water

and non-storm water pollutants from two of Defendant's adjacent facilities into the waters of

the United States in violation of the Act and the State of California's "Waste Discharge

COMPLAINT

1

Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities," State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, (hereinafter the "Permit" or the "General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Federal Water Pollution Control Act are ongoing and continuous.

2.       The failure on the part of persons and facilities such as Defendant and its industrial facility to comply with storm water requirements is recognized as a significant cause of the continuing decline in water quality of San Pablo Creek, San Pablo Bay, San Francisco Bay ("Bay"), and other area receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm pollution amounts to a substantial portion of the total pollution entering the aquatic environment each year.  With every rainfall event, millions of gallons of polluted rainwater originating from industries within the surrounding area pour into the Bay.

3.       The continuing decline in water quality in the San Francisco Bay is a matter of serious public concern.  The entire Bay and all of its major tributaries have been identified by the State Board, the Regional Water Quality Control Board of the San Francisco Bay Region ("Regional Board"), and Environmental Protection Agency ("EPA") as impaired water bodies under Section 303(d) of the Clean Water Act.  33 U.S.C. § 1313(d).

## II.       **JURISDICTION AND VENUE**

4.       This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

5. On or about December 12, 2008, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Defendant; the Administrator of the United States EPA; the Administrator of EPA Region IX; the Executive Director of the State Board; and to the Executive Officer of the Regional Board. A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

6. More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

7. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district. Pursuant to Local Rule 3-2(c), intradistrict venue is proper in Oakland, California because the sources of the violations are located within Contra Costa County, California.

## III.  PARTIES

8. Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including San Pablo Creek, San Pablo Bay, San Francisco Bay and their tributaries. CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary,

1   directly initiates enforcement actions on behalf of itself and its members.

2        9.     Members of CSPA reside in and around the Bay and enjoy using the Bay for

3   recreation and other activities.  Members of CSPA use and enjoy the waters into which

4   Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

5   Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

6   and engage in scientific study including monitoring activities, among other things.

7   Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

8   such threats and impairments.  Thus, the interests of CSPA's members have been, are being,

9   and will continue to be adversely affected by Defendant's failure to comply with the Clean

10  Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused

11  by Defendant's activities.

12       10.    Plaintiff is informed and believes, and thereupon alleges, that Defendant

13  REPUBLIC SERVICES, INC. (hereinafter "Defendant" or "Republic Services") is a

14  corporation organized under the laws of California.  Defendant Republic Services operates

15  both a transfer station/recycling center and a landfill in Richmond, California.

16  **IV.    STATUTORY BACKGROUND**

17       11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

18  pollutant into waters of the United States, unless such discharge is in compliance with

19  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

20  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

21  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

22       12.    Section 402(p) of the Act establishes a framework for regulating municipal and

23  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States

24  with approved NPDES permit programs are authorized by Section 402(p) to regulate

25  industrial storm water discharges through individual permits issued to dischargers or through

26  the issuance of a single, statewide general permit applicable to all industrial storm water

27  dischargers.  33 U.S.C. § 1342(p).

28       13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

COMPLAINT
4

1    U.S. EPA has authorized California's State Board to issue NPDES permits including general
2    NPDES permits in California.

3          14.    The State Board elected to issue a statewide general permit for industrial storm
4    water discharges.  The State Board issued the General Permit on or about November 19,
5    1991, modified the General Permit on or about September 17, 1992, and reissued the
6    General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water
7    Act, 33 U.S.C. § 1342(p).

8          15.    In order to discharge storm water lawfully in California, industrial dischargers
9    must comply with the terms of the General Permit or have obtained and complied with an
10   individual NPDES permit.  33 U.S.C. § 1311(a).

11         16.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of
12   the General Permit requires dischargers to reduce or prevent pollutants in their storm water
13   discharges through implementation of the Best Available Technology Economically
14   Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional
15   Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include
16   both nonstructural and structural measures. General Permit, Section A(8).  Discharge
17   Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-
18   storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.
19   Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to
20   any surface or ground water that adversely impact human health or the environment.
21   Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that
22   cause or contribute to an exceedance of any applicable water quality standards contained in a
23   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

24         17.    EPA has established Parameter Benchmark Values as guidelines for
25   determining whether a facility discharging industrial storm water has implemented the
26   requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established
27   Parameter Benchmark Values for the following parameters, among others: total suspended
28   solids – 100 mg/L; pH – 6.0-9.0 s.u.; lead – 0.0816 mg/L; copper – 0.0636 mg/L; chemical

COMPLAINT

oxygen demand – 120 mg/L; oil and grease – 15 mg/L; total organic carbon – 110 mg/L; aluminum – 0.75 mg/L; iron – 1.0 mg/L; ammonia – 19 mg/L; and zinc – 0.117 mg/L. The State Board has proposed a Benchmark Value for electrical conductance of 200 μmhos/cm.

18.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI"). The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

19.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control equipment and measures that comply with the BAT and BCT standards. The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992. The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)). The SWPPP's BMPs must implement BAT and BCT (Section B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may

occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit had to implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled."  Section B(5)(c)(i)-(iii) requires dischargers to sample

and analyze during the wet season for basic parameters, such as pH, total suspended solids ("TSS"), electrical conductance, and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

23.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9) and (10) and B(14).

24.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of $32,500 per day pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

25.     The Regional Board has established water quality standards for the San Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

26.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

27.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."

28.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of

the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

29.    The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and lead of 0.0081 mg/L (4-day average) and 0.21 mg/L (1-hour average).

30.    The EPA has adopted saltwater numeric water quality standards for copper of 0.0031 mg/L (Criteria Maximum Concentration – "CMC") and .0048 mg/L (Criteria Continuous Concentration – "CCC"), for lead of 0.210 mg/L (CMC) and 0.0081 mg/L (CCC), for zinc of 0.090 mg/L (CMC) and 0.081 mg/L (CCC).

## V.    STATEMENT OF FACTS

### Violations at Richmond Sanitary Services

31.    Defendant Republic Services operates Richmond Sanitary Service ("RSS"), a transfer station/recycling center at 1 Parr Boulevard in Richmond, California.  RSS is engaged in storing, processing, and trucking various waste materials as well as recycling operations.  RSS falls within the Standard Industrial Classification ("SIC") Codes 5093 and 4212.  RSS covers about twelve acres, the majority of which is paved and used for transporting and storing waste materials throughout RSS.  On information and belief, Plaintiff alleges that there is at least one large building located on the property.  On information and belief, Plaintiff alleges that recycling and processing is conducted both inside and outside of this building.  Materials are transported in and out of this building for storage in the paved and unpaved areas of RSS.

32.    Defendant channels and collects storm water falling on RSS through four storm water outfalls.  Each storm drain collects storm water runoff from a particular area of RSS.  These outfalls discharge the storm water to San Pablo Creek which flows into San Pablo Bay, a part of the San Francisco Bay.

33.    The industrial activities at the site include the storage, processing, and transfer of a variety of materials including construction material and debris, hazardous material,

metal, organic material, oils, paint, paper, plastic, and other materials.  Plaintiff alleges on information and belief that industrial activities at the site include recycling operations for materials such as paper, plastic, glass, wood/yard waste, scrap metal, tires, construction debris and other materials.  Industrial activities at the site include the storage and maintenance of trucks, tractors, and other machinery used to transfer and dispose of these materials.  Materials handled at RSS include motor oil, hydraulic oil, transmission oil, greases, used oil and oil filters, baled aluminum cans, baled paper, glass, paint, and solvents.

34.    Significant activities at the site take place outside and are exposed to rainfall.  These activities include the storage and processing of the numerous types of materials handled by RSS; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of materials occurs both inside and outside.  Trucks enter and exit RSS directly from and to a public road.  Plaintiff alleges on information and belief that trucks and forklifts are the primary means of moving materials around the unpaved storage areas of RSS.  Plaintiff is informed and believes, and thereupon alleges, that recycling and transfer activities also occur in exposed areas at RSS.  Plaintiff alleges on information and belief that some of the exposed surfaces at RSS are unpaved and sediment and other materials are disturbed as a result of the recycling, storage, and transfer processes.  These areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms and other storm water controls.

35.    Industrial machinery, heavy equipment and vehicles, including trucks and trailers are operated and stored at RSS in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows and that such machinery and equipment track sediment and other contaminants throughout RSS.

36.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of RSS, collecting suspended sediment, dirt, oils, grease, and other pollutants as it flows toward the storm water drain.  Storm water and any pollutants

contained in that storm water entering the drains flows directly to storm drains and channels that flow directly to San Pablo Creek and San Pablo Bay.

37.     The management practices at RSS are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  RSS lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  RSS lacks sufficient structural controls to prevent the discharge of water once contaminated.  RSS lacks adequate storm water pollution treatment technologies to treat contaminated storm water prior to its flowing off of RSS.

38.     Since at least February 14, 2005, Defendant has taken samples or arranged for samples to be taken of storm water discharges at RSS.  The sample results were reported in RSS' annual reports submitted to the Regional Board.  Defendant Republic Services certified each of those annual reports pursuant to Sections A and C of the General Permit.

39.     Since at least February 14, 2005, RSS has detected total suspended solids, oil & grease, and electrical conductance in storm water discharged from RSS.  Levels of total suspended solids and oil & grease detected in RSS' storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in RSS' storm water have been in excess of water quality standards established in the Basin Plan.

40.     The levels of total suspended solids in storm water detected by RSS have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA. For example, on December 4, 2007, the level of suspended solids measured by Defendant in RSS' discharged storm water was 1,600 mg/L.  That level of total suspended solids is sixteen times the benchmark value for suspended solids established by EPA.  RSS also has measured levels of total suspended solids in storm water discharged from RSS in excess of EPA's benchmark value of 100 mg/L on March 26, 2007; December 21, 2006; March 20, 2006; and February 14, 2005.

41.     The level of oil & grease in storm water detected by RSS has exceeded the

1   benchmark value for oil & grease of 15 mg/L established by EPA.  On February 14, 2005,

2   the level of oil & grease measured by Defendant in the RSS' discharged storm water was 25

3   mg/L.  That level of oil & grease is nearly twice the benchmark value for oil & grease

4   established by EPA.

5           42.     The electrical conductance levels detected by RSS in its storm water have been

6   greater than the benchmark value of 200 μmho/cm proposed by the State Board.  For

7   example, on March 20, 2006, the electrical conductance level measured by Defendant in

8   RSS' discharged storm water was 900 μmho/cm.  That electrical conductance level is four

9   and a half times the State Board's proposed benchmark value.  RSS also has measured levels

10  of electrical conductance in storm water discharged from RSS in excess of the State Board's

11  proposed value of 200 μmho/cm on December 4, 2007; March 26, 2007; December 21,

12  2006; and February 14, 2005.

13          43.     On information and belief, Plaintiff alleges that Defendant has failed to

14  analyze its storm water samples at RSS for chemical oxygen demand as required by the

15  Table D of the General Permit since at least February 14, 2005.

16          44.     On information and belief, Plaintiff alleges that Defendant has failed to

17  analyze its storm water samples at RSS for iron as required by the Table D of the General

18  Permit since at least February 14, 2005.

19          45.     On information and belief, Plaintiff alleges that Defendant has failed to

20  analyze its storm water samples at RSS for lead as required by the Table D of the General

21  Permit since at least February 14, 2005.

22          46.     On information and belief, Plaintiff alleges that Defendant has failed to

23  analyze its storm water samples at RSS for zinc as required by the Table D of the General

24  Permit since at least February 14, 2005.

25          47.     On information and belief, Plaintiff alleges that Defendant has failed to

26  analyze its storm water samples at RSS for copper as required by the Table D of the General

27  Permit since at least February 14, 2005.

28          48.     On information and belief, Plaintiff alleges that Defendant has failed to

COMPLAINT
                                            12

analyze its storm water samples at RSS for aluminum as required by the Table D of the General Permit since at least February 14, 2005.

49.     On information and belief, Plaintiff alleges that Defendant has failed to collect the two required storm water samples from each storm water discharge location at RSS since at least February 14, 2005.  During the 2006-2007 rainy season, RSS only collected two samples from discharge location "RSS-4" and one sample from discharge location "RSS-1." RSS failed to explain in its annual report for that rainy season why it was unable to collect a second sample from RSS-1 and two samples from the third discharge location.  During both the 2005-2006 and the 2004-2005 rainy seasons, RSS failed to collect storm water samples for a second event from RSS-1 and RSS-4 and failed to explain to collect two samples from the third discharge location.  In its annual reports prepared for those two rainy seasons, RSS failed to explain why it did not collect storm water samples for a second event from RSS-1 and RSS-4 and failed to explain why it was unable to collect two samples from the third discharge location.  During the 2003-2004 rainy season, RSS did not collect storm water samples for a second event from RSS-2 and did not collect two samples from the third discharge location.  In the annual report for the 2003-2004 rainy season, RSS failed to explain why it did not collect storm water samples for a second event from RSS-2 and failed to explain why it was unable to collect two samples from the third discharge location.

50.     On information and belief, Plaintiff alleges that since at least February 14, 2005, Defendant has failed to implement BAT and BCT at RSS for its discharges of total suspended solids, oil & grease, electrical conductance, and other pollutants.  The General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

51.     On information and belief, Plaintiff alleges that since at least April 22, 2004, Defendant has failed to implement an adequate SWPPP for RSS.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for RSS does not set forth site-specific best management practices for RSS that are consistent with BAT or BCT for RSS.

COMPLAINT
13

Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for RSS does not include an assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or a description of best management practices to be implemented at RSS to reduce pollutant discharges.  According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not contain an accurate map that clearly delineates the boundaries of RSS, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge systems, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity.

52.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from RSS directly to channels that flow into San Pablo Creek and San Pablo Bay.

53.     Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to revise RSS' SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

54.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report for RSS certifying compliance with the General Permit since at least April 22, 2004.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining RSS' storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at RSS.

55.     Information available to Plaintiff indicates that Defendant has not fulfilled the

1    requirements set forth in the General Permit for discharges from RSS due to the continued

2    discharge of polluted storm water.  Plaintiff is informed and believes, and thereupon alleges,

3    that all of the violations alleged in this Complaint are ongoing and continuing.

4           **Violations at West Contra Costa Sanitary Landfill**

5           56.     Defendant Republic Services operates West Contra Costa Sanitary Landfill

6    ("WCL"), a Class II sanitary landfill located at 1 Parr Boulevard in Richmond, California.

7    WCL is engaged in the disposal of municipal solid waste; wood recycling, composting, and

8    asphalt/concrete crushing; and maintains a Hazardous Waste Management Facility leachate

9    treatment plant.  WCL falls within the Standard Industrial Classification ("SIC") Code 4953.

10   WCL covers about 350 acres, the large majority of which is unpaved.  On information and

11   belief, Plaintiff alleges that there are at least three large buildings located on the property.

12   On information and belief, Plaintiff alleges that recycling is conducted both inside and

13   outside of these buildings and that disposal is conducted outside of these buildings.

14          57.     Defendant channels and collects storm water falling on WCL through at least

15   eleven storm water outfalls.  Each storm drain collects storm water runoff from a particular

16   area of WCL.  These outfalls discharge the storm water directly to San Pablo Bay, a part of

17   the San Francisco Bay.

18          58.     The industrial activities at the site include the processing, storage, and disposal

19   of a variety of materials including municipal solid waste, dirt, wood scraps, metals, and

20   organic material.  It also includes the storage and maintenance of trucks, tractors, and other

21   machinery used to transfer and dispose of these materials.

22          59.     Significant activities at the site take place outside and are exposed to rainfall.

23   These activities include the storage and disposal of the numerous types of materials handled

24   by WCL; the storage and use of vehicles and equipment for materials handling; and the

25   storage, handling, and disposal of waste materials.  Loading and delivery of materials occurs

26   outside.  Trucks enter and exit WCL directly from and to a public road.  Trucks, tractors, and

27   other machinery are the primary means of moving materials around the unpaved areas of

28   WCL.  WCL's exposed areas contain large piles of a variety of materials.  Plaintiff alleges

COMPLAINT

1   on information and belief that many of the exposed surfaces at WCL are unpaved and

2   sediment and other materials are disturbed as a result of the storage and disposal processes.

3   These areas are exposed to storm water and storm flows due to the lack of overhead

4   coverage, berms and other storm water controls.

5        60.    Industrial machinery, heavy equipment and vehicles, including trucks and

6   tractors are operated and stored at WCL in areas exposed to storm water flows.  Plaintiff is

7   informed and believes, and thereupon alleges, that such machinery and equipment leak

8   contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed

9   to storm water flows, and that such machinery and equipment track sediment and other

10   contaminants throughout WCL.

11        61.    Plaintiff is informed and believes, and thereupon alleges that the storm water

12   flows easily over the surface of WCL, collecting suspended sediment, dirt, oils, grease, and

13   other pollutants as it flows toward the storm water drain.  Storm water and any pollutants

14   contained in that storm water entering the drains flows directly to storm drains and channels

15   that flow directly to San Pablo Bay.

16        62.    The management practices at WCL are wholly inadequate to prevent the

17   sources of contamination described above from causing the discharge of pollutants to waters

18   of the United States.  WCL lacks sufficient structural controls such as grading, berming,

19   roofing, containment, or drainage structures to prevent rainfall and storm water flows from

20   coming into contact with these and other exposed sources of contaminants.  WCL lacks

21   sufficient structural controls to prevent the discharge of water once contaminated.  WCL

22   lacks adequate storm water pollution treatment technologies to treat storm water once

23   contaminated.

24        63.    Since at least January 4, 2005, Defendant has taken samples or arranged for

25   samples to be taken of storm water discharges at WCL.  The sample results were reported in

26   WCL's annual reports submitted to the Regional Board.  Defendant Republic Services

27   certified each of those annual reports pursuant to Sections A and C of the General Permit.

28        64.    Since at least January 4, 2005, WCL has detected electrical conductance in

COMPLAINT

16

storm water discharged from WCL.  Since at least February 14, 2005, WCL has detected total suspended solids, iron, and total organic carbon in storm water discharged from WCL. Levels of these pollutants detected in WCL's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in WCL's storm water have been in excess of water quality standards established in the Basin Plan.

65.    The levels of total suspended solids in storm water detected by WCL have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA. For example, on January 3, 2008, the level of total suspended solids measured by Defendant in WCL's discharged storm water was 2,100 mg/L.  That level of total suspended solids is twenty-one times the benchmark value for total suspended solids established by EPA.  WCL also has measured levels of total suspended solids in storm water discharged from WCL in excess of EPA's benchmark value of 100 mg/L on February 19, 2008; December 21, 2006; March 23, 2006; March 20, 2006; and February 14, 2005.

66.    The levels of iron in storm water detected by WCL have exceeded the benchmark value for iron of 1.0 mg/L established by EPA.  For example, on January 3, 2008, the level of iron measured by Defendant in the WCL's discharged storm water was 110 mg/L.  That level of iron is one hundred ten times the benchmark value for iron established by EPA.

67.    The level of total organic carbon in storm water detected by WCL has exceeded the benchmark value for total organic carbon of 110 mg/L established by EPA.  On February 14, 2005, the level of total organic carbon measured by Defendant in the WCL's discharged storm water was 270 mg/L.  That level of total organic carbon is nearly two and a half times the benchmark value for total organic carbon established by EPA.

68.    The electrical conductance levels detected by WCL in its storm water have been greater than the benchmark value of 200 μmho/cm proposed by the State Board.  For example, on February 19, 2008, the electrical conductance level measured by Defendant in WCL's discharged storm water was 3300 μmho/cm.  That electrical conductance level is sixteen and a half times the State Board's proposed benchmark value.  WCL also has

1  measured levels of electrical conductance in storm water discharged from WCL in excess of

2  the State Board's proposed value of 200 μmho/cm on May 2, 2008; January 3, 2008;

3  December 21, 2006; March 30, 2006; March 23, 2006; March 20, 2006; February 14, 2005;

4  and January 4, 2005.

5       69.     On information and belief, Plaintiff alleges that Defendant has failed to collect

6  the two required storm water samples from each storm water discharge location at WCL

7  since at least January 4, 2005.  In the 2007-2008 Annual Report, WCL indicated that it has

8  eleven storm water discharge locations. In earlier reports, WCL indicated that it has seven

9  discharge locations.  WCL has never sampled discharges from seven distinct storm water

10 discharge locations in its Annual Reports from the past five years, nor has it given any

11 explanation for its failure to do so.  During the 2003-2004, 2004-2005, 2005-2006, and

12 2006-2007 rainy seasons, WCL failed to reasonably explain in its annual reports why it was

13 unable to collect one or both of the required two storm water samples from each of its

14 outfalls.

15      70.     On information and belief, Plaintiff alleges that Defendant has failed to

16 comply with Section B(4) of the General Permit for its failures to conduct monthly wet

17 season visual observations at WCL for October, November, December, January, February,

18 April, and May during the 2005-2006 rainy season; and for October, November, December,

19 January, March, April, and May during the 2004-2005 rainy season.

20      71.     On information and belief, Plaintiff alleges that since at least January 4, 2005,

21 Defendant has failed to implement BAT and BCT at WCL for its discharges of total

22 suspended solids, iron, total organic carbon, electrical conductance, and other pollutants.

23 The General Permit requires that Defendant implement BAT for toxic and nonconventional

24 pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the

25 date of this Complaint, Defendant has failed to implement BAT and BCT.

26      72.     On information and belief, Plaintiff alleges that since at least April 22, 2004,

27 Defendant has failed to implement an adequate SWPPP for WCL.  Plaintiff is informed and

28 believes, and thereupon alleges, that the SWPPP prepared for WCL does not set forth site-

COMPLAINT

18

specific best management practices for WCL that are consistent with BAT or BCT for WCL. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for WCL does not include an assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or a description of best management practices to be implemented at WCL to reduce pollutant discharges. According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not contain an accurate map that clearly delineates the boundaries of WCL, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge systems, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity.

73.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from WCL directly into San Pablo Bay.

74.     Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to revise WCL' SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

75.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report for WCL certifying compliance with the General Permit since at least April 22, 2004. Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining WCL' storm water controls and certifying compliance with the General Permit. Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at WCL.

COMPLAINT

76.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from WCL due to the continued discharge of polluted storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

77.     Plaintiff re-alleges and incorporate Paragraphs 1-76, as if fully set forth herein.

78.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at RSS and WCL for its discharges of total suspended solids, total organic carbon, iron, oil & grease, electrical conductance, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

79.     Each day since April 22, 2004 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

80.     Defendant has been in violation of the BAT/BCT requirements every day since April 22, 2004.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement adequate BAT/BCT for RSS and WCL.

### SECOND CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

81.     Plaintiff re-alleges and incorporate Paragraphs 1-80, as if fully set forth herein.

82.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing an adequate SWPPP no later than October 1, 1992.

COMPLAINT

20

83.     Defendant has failed to develop and implement an adequate SWPPP for RSS and WCL.  Defendant's ongoing failure to develop and implement an adequate SWPPP for RSS and WCL is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles at the site; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from RSS and WCL at levels in excess of EPA benchmark values.

84.     Defendant has failed to update both RSS' and WCL's SWPPPs in response to the analytical results of RSS' and WCL's storm water monitoring.

85.      Each day since April 22, 2004, that Defendant has failed to develop, implement and update an adequate SWPPP for RSS and for WCL is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

86.     Defendant has been in violation of the SWPPP requirements every day since April 22, 2004.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for RSS and WCL.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

87.     Plaintiff re-alleges and incorporates Paragraphs 1-86, inclusive, as if fully set forth herein.

88.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

89.     Defendant has failed to develop and implement an adequate monitoring and reporting program for RSS and WCL.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their

COMPLAINT

failure to collect two storm water samples at each discharge location at both RSS and WCL.

90.     Each day since April 22, 2004, that Defendant has failed to develop and implement an adequate monitoring and reporting program for RSS and WCL in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

91.     Plaintiff re-alleges and incorporates Paragraphs 1-90, inclusive, as if fully set forth herein.

92.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

93.     Plaintiff is informed and believes, and thereupon alleges, that since at least April 22, 2004, Defendant has been discharging polluted storm water from RSS and WCL in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

94.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at RSS and WCL, becoming contaminated with iron, electrical conductance, and other unmonitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated from RSS and WCL into a channels or storm drains that flow directly to San Pablo Bay and San Pablo Creek, which flows into the San Francisco Bay.

COMPLAINT

95.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

96.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

97.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

98.     Every day since at least April 22, 2004, that Defendant has discharged and continues to discharge polluted storm water from RSS and WCL in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
**Failure to Submit Annual Report and
False Certification of Compliance In Annual Report
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

99.     Plaintiff re-alleges and incorporate Paragraphs 1-98, as if fully set forth herein.

100.    Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 2004.

101.    Each day since at least June 30, 2004, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as

COMPLAINT

23

1   alleged herein;

2           b.   Enjoin Defendant from discharging polluted storm water from RSS and

3   WCL unless authorized by the Permit;

4           c.   Enjoin Defendant from further violating the substantive and procedural

5   requirements of the Permit;

6           d.   Order Defendant to immediately implement storm water pollution control

7   and treatment technologies and measures that are equivalent to BAT or BCT and prevent

8   pollutants in RSS' and WCL's storm water from contributing to violations of any water quality

9   standards;

10          e.   Order Defendant to comply with the Permit's monitoring and reporting

11   requirements, including ordering supplemental monitoring to compensate for past monitoring

12   violations;

13          f.   Order Defendant to prepare SWPPPs consistent with the Permit's

14   requirements and implement procedures to regularly review and update the SWPPPs;

15          g.   Order Defendant to provide Plaintiff with reports documenting the quality

16   and quantity of their discharges to waters of the United States and their efforts to comply with

17   the Act and the Court's orders;

18          h.   Order Defendant to pay civil penalties of $32,500 per day per violation for

19   each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§

20   1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

21          i.   Order Defendant to take appropriate actions to restore the quality of waters

22   impaired or adversely affected by their activities;

23          j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness,

24   compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

25   ///

26   ///

27   ///

28   ///

COMPLAINT

1          k.  Award any such other and further relief as this Court·may deem appropriate.

2

3     Dated: April 22, 2009              Respectfully submitted,

4                                        LOZEAU DRURY LLP

5

6                                  By:   _____
                                         Douglas J. Chermak
7                                        Attorney for Plaintiff
                                         CALIFORNIA SPORTFISHING PROTECTION
8                                        ALLIANCE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                      25

EXHIBIT A

# California Sportfishing Protection Alliance
*"An Advocate for Fisheries, Habitat and Water Quality"*
**3536 Rainier Avenue, Stockton, CA 95204**
**Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com**

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

December 11, 2008

James E. O'Connor, Chief Executive Officer
Michael Cordesman, President
Republic Services, Inc.
110 SE Sixth Street
Suite 2800
Fort Lauderdale, Florida 33301


C. David Zeiger, Area Compliance Manager
Michael Boyle, Environmental Specialist
Richmond Sanitary Service, Inc.
P.O. Box 4100
Richmond, CA 94804-0100

Peter Jenkins, Maintenance Manager
Richmond Sanitary Service
3260 Blume Drive, Suite 200
Richmond, CA 94806

Dennis Carvalho
C. David Zeiger, Area Compliance Manager
West County Landfill, Inc.
3260 Blume Drive, Suite 200
Richmond, CA 94806

Bryce Howard, Operations Manager
C. David Zeiger, Area Compliance Manager
Michael Boyle, Environmental Specialist
West Contra Costa Sanitary Landfill
P.O. Box 4100
Richmond, CA 94804-0100

**Re:** **Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act**

Dear Messrs. O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring both at Richmond Sanitary Service ("RSS") and at the West Contra Costa Sanitary Landfill ("WCL") located at #1 Parr Blvd. in Richmond, California.  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other California waters.  RSS is owned by Richmond Sanitary Service, Inc., which is owned by Republic Services, Inc.  West Contra Costa Sanitary Landfill is owned by West County Landfill, Inc. which is owned by Republic Services, Inc.  This letter is being sent to you as the responsible owners, officers, or operators of RSS and WCL (all recipients are hereinafter collectively referred to as "Republic Services").

This letter addresses Republic Services' unlawful discharge of pollutants from RSS and WCL into San Pablo Creek and San Pablo Bay.  RSS and WCL are discharging storm water

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 2 of 17

pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The WDID identification number for RSS listed on documents submitted to the Regional Board is 207I002523, and the WDID identification number for WCL on documents submitted to the Regional Board is 207I005532. RSS and WCL are engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at RSS and WCL. Consequently, Republic Services is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Republic Services, Inc., Richmond Sanitary Service, Inc., West County Landfill, Inc., James E. O'Connor, Michael Cordesman, C. David Zeiger, Michael Boyle, and Peter Jenkins under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below. This letter will first provide background information that pertains to both RSS and WCL, describe the alleged violations of the NPDES permit for RSS, describe the alleged violations of the NPDES permit for WCL, indicate the persons responsible for the violations, indicate the name and address of the noticing party, name the counsel representing CSPA in this matter, and describe the relevant penalty provisions.

## I.     Background.

On May 15, 1997, RSS filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). RSS certifies that that it is classified under SIC code 5093 ("processing of scrap material") and under SIC code 4212 ("local trucking without storage"). According to its most recent annual report filed pursuant to the General Permit, RSS collects and discharges storm water from its 12-acre industrial site through four outfalls that discharge into San Pablo Bay and San Pablo Creek, which flows into the San Francisco Bay.

On March 23, 1992, WCL filed its NOI. WCL certifies that it is classified under SIC code 4953 ("landfills and land application site"). According to its most recent annual report filed pursuant to the General Permit, WCL collects and discharges storm water from its 350-acre industrial site through eleven outfalls that discharge into San Pablo Bay, a part of San Francisco Bay.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 3 of 17

The Regional Board has identified waters of both San Pablo Bay and San Francisco Bay as failing to meet applicable water quality standards for PCBs, selenium, exotic species, dioxins, pesticides, and mercury.  *See* http://www.waterboards.ca.gov/tmdl/docs/303dlists2006/ final/r2_final303dlist.pdf.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the San Francisco Bay in the "Water Quality Control Plan for the San Francisco Bay Basin**,**" generally referred to as the Basin Plan.  *See* http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/basin_plan/docs/basin_plan07.pdf.  The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning.  The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features."  *Id.* at 2.1.16.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Bay for contact and non-contact water recreation.

The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."  *Id.* at 3.3.18.  The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."  *Id.* at 3.3.7.  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."  *Id.* at 3.3.14.  The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and lead of 0.0081 mg/L (4-day average) and 0.21 mg/L (1-hour average).  *Id.* at Table 3-3.  The Basin Plan established Freshwater Water Quality Objectives for zinc of 0.12 mg/L (4-day average and1-hour average); for copper of 0.009 mg/L (4-day average) and 0.013 mg/L (1-hour average); and lead of 0.0025 mg/L (4-day average) and 0.065 mg/L (1-hour average).  *Id.* at Table 3-4.  The U.S. Environmental Protection Agency ("EPA") has adopted saltwater numeric water quality standards for copper of 0.0031 mg/L (Criteria Maximum Concentration – "CMC") and .0048 mg/L (Criteria Continuous Concentration – "CCC"), for lead of 0.210 mg/L (CMC) and 0.0081 mg/L (CCC), and for zinc of 0.090 mg/L (CMC) and 0.081 mg/L (CCC).  65 Fed.Reg. 31712 (May 18, 2000).  EPA has adopted freshwater numeric water quality standards for copper of 0.013 mg/L (CMC) and 0.009 mg/L (CCC); for lead of 0.065 mg/L (CMC) and 0.0025 mg/L (CCC); and for zinc of 0.12 mg/L (CMC and CCC).

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 4 of 17

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by RSS and WCL: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, total organic carbon ("TOC") – 110 mg/L, chemical oxygen demand ("COD") – 120 mg/L, aluminum – 0.75 mg/L,  zinc – 0.117 mg/L, iron – 1.0 mg/L, copper – 0.0636 mg/L, lead – 0.0816 mg/L, ammonia – 19 mg/L.  The State Water Resources Control Board ("State Board") also has proposed adding a benchmark level to the General Permit for specific conductance (200 µmho/cm).

## II.    RSS' Alleged Violations of the NPDES Permit.

### A.    *Discharges in Violation of the Permit.*

RSS has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 5 of 17

RSS has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, oil & grease, and other pollutants in violation of the General Permit.  RSS' sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from RSS[1] have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|------|-----------|------------------------|-----------------|------------------------------------------|
| 12/4/2007 | Total Suspended Solids | 1,600 mg/L | 100 mg/L | RSS-1 (entrance) |
| 12/4/2007 | Specific Conductivity | 320 µmho/cm | 200 µmho/cm (proposed) | RSS-1 (entrance) |
| 3/26/2007 | Total Suspended Solids | 590 mg/L | 100 mg/L | RSS-4 |
| 3/26/2007 | Specific Conductivity | 250 µmho/cm | 200 µmho/cm (proposed) | RSS-4 |
| 12/21/2006 | Total Suspended Solids | 1,600 mg/L | 100 mg/L | RSS-4 |
| 12/21/2006 | Specific Conductivity | 530 µmho/cm | 200 µmho/cm (proposed) | RSS-4 |
| 12/21/2006 | Total Suspended Solids | 230 mg/L | 100 mg/L | RSS-1 |
| 3/20/2006 | Total Suspended Solids | 2,200 mg/L | 100 mg/L | RSS-1 (Drainage from paved vehicle storage area) |
| 3/20/2006 | Specific Conductivity | 900 µmho/cm | 200 µmho/cm (proposed) | RSS-1 (Drainage from paved vehicle storage area) |
| 3/20/2006 | Total Suspended Solids | 580 mg/L | 100 mg/L | RSS-4 (Drainage from southwest |

---

[1] RSS' annual reports include laboratory sampling results for storm water discharges from outfalls for both RSS and WCL.  RSS' reports seem to indicate that the outfalls with "RSS" in the title are particular to RSS.  Thus, only the discharges associated with the "RSS" outfalls are reported in this table.  Discharges associated with the other outfalls are presumed to apply to WCL and are indicated in the table in Section III(A) of this letter.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 6 of 17

| | | | | paved storage tank area) |
|---|---|---|---|---|
| 2/14/2005 | Total Suspended Solids | 1,800 mg/L | 100 mg/L | RSS-1 (Drainage from paved vehicle storage area) |
| 2/14/2005 | Specific Conductivity | 330 µmho/cm | 200 µmho/cm (proposed) | RSS-1 (Drainage from paved vehicle storage area) |
| 2/14/2005 | Oil & Grease | 25 mg/L | 15 mg/L | RSS-1 (Drainage from paved vehicle storage area) |
| 2/14/2005 | Total Suspended Solids | 210 mg/L | 100 mg/L | RSS-4 (Drainage from southwest paved storage tank area) |

CSPA's investigation, including its review of RSS' analytical results documenting pollutant levels in RSS' storm water discharges well in excess of applicable water quality standards, EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that RSS has not implemented BAT and BCT for its discharges of TSS, specific conductivity, O&G, and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. RSS was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, RSS is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since December 11, 2003, and that will occur at RSS subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that RSS has discharged storm water containing impermissible levels of TSS, specific conductivity, and O&G in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from RSS are ongoing. Each discharge of each of these pollutants in storm water constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act since December 11, 2003.

Notice of Violations and Intent to File Suit

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 7 of 17

**B.      Failure to Sample, Analyze, and Inspect Storm Events and Mandatory Parameters**

With some limited adjustments, facilities covered by the General Permit must sample two storm events per season from each of their storm water discharge locations.  General Permit, Section B(5)(a).  "Facility operators shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season."  *Id*.  "All storm water discharge locations shall be sampled."  *Id*.  "Facility operators that do not collect samples from the first storm event of the wet season are still required to collect samples from two other storm events of the wet season and shall explain in the Annual Report why the first storm event was not sampled."  *Id*.

RSS has failed to collect the two required storm water samples from each storm water discharge location in each of the last five years despite discharging storm water from its facility.  RSS failed to take the requisite samples when storm water discharges from the Facility did not occur within the first hour of a storm event.  The General Permit does not excuse a facility from the requisite sampling where discharges from the facility occur more than an hour after the inception of a storm event.  During the 2006-2007 rainy season, RSS only collected two samples from RSS-4 and one sample from RSS-1, failing to explain why it was unable to collect a second sample from RSS-1 and two samples from the third discharge location.  During both the 2005-2006 and the 2004-2005 rainy seasons, RSS failed to explain why it did not collect storm water samples for a second event from RSS-1 and RSS-4 and failed to explain why it was unable to collect two samples from the third discharge location.  During the 2003-2004 rainy season, RSS failed to explain why it did not collect storm water samples for a second event from RSS-2 and failed to explain why it was unable to collect two samples from the third discharge location.  Each of these failures to collect requisite storm water samples is a violation of the General Permit, Section B(5).

Collected samples must be analyzed for TSS, pH, specific conductance, and either TOC or O&G.  General Permit, Section B(5)(c)(i).  Facilities also must analyze their storm water samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities.  *Id*. at Section B(5)(c)(ii).  Certain SIC Codes also must analyze for additional specified parameters.  *Id*. at Section B(5)(c)(iii); *id.*, Table D.  Facilities within SIC Code 5093, including RSS, must analyze each of its storm water samples for COD, iron, lead, zinc, copper, and aluminum.  *Id.*, Table D (Sector N).  CSPA's review of RSS' monitoring data indicates that RSS has failed to analyze for COD, iron, lead, zinc, copper, and aluminum in every storm water sample taken at RSS during the past five years and has not provided a sufficient explanation for its failure to do so in each of the past five years.  Each failure to analyze for a specific required parameter is a violation of General Permit, Section B(5)(c)(iii).  Six samples per annual report (at least three storm drains times two storm events) times five annual reports (2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008) times six parameters adds up to 180 distinct violations of the General Permit.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 8 of 17

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event." RSS failed to conduct any visual observations during the 2006-2007 rainy season, which is a violation of the Section B(3), B(4), and B(7) of the General Permit. RSS did not provide explanations for its failures to conduct monthly wet season visual observations for October, November, December, January, February, April, and May during the 2005-2006 rainy season; for October, November, December, January, March, April, and May during the 2004-2005 rainy season; and for December, January, February, March, April, and May during the 2003-2004 rainy season. Each of these failures to conduct monthly wet season visual observations is a violation of the General Permit, Section B(4).

The above listed violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act since December 11, 2003.

C.    **Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.**

Section A and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 9 of 17

significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at RSS as well as RSS' Annual Reports indicate that RSS has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. RSS has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. RSS has been in continuous violation of Section A and Provision E(2) of the General Permit every day since December 11, 2003 at the very latest, and will continue to be in violation every day that RSS fails to prepare, implement, review, and update an effective SWPPP. Republic Services is subject to penalties for violations of the Order and the Act occurring since December 11, 2003.

### D.  Failure to Develop and Implement an Adequate Monitoring and Reporting Program

The above referenced data was obtained from the RSS' monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that RSS has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by RSS is not representative of the quality of the RSS' various storm water discharges or RSS failed to monitor all qualifying storm water discharges, CSPA, on information and belief, alleges that RSS' monitoring program violates Sections B(3), (4), and (7) of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since December 11, 2003.

### E.  Failure to File True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 10 of 17

For the last five years, RSS and its agents, C. David Zeiger and Michael Boyle, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, RSS has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time RSS failed to submit a complete or correct report and every time RSS or its agents falsely purported to comply with the Act. Republic Services is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since December 11, 2003.

## III.    WCL's Alleged Violations of the NPDES Permit.

### A.    *Discharges in Violation of the Permit.*

WCL has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. The relevant permit requirements are described in this notice of intent letter above in Section II(A).

WCL has discharged and continues to discharge storm water with unacceptable levels of TSS, specific conductivity, total organic carbon, iron, and other pollutants in violation of the General Permit. WCL's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.

The following discharges of pollutants from WCL[2] have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|------|-----------|------------------------|-----------------|------------------------------------------|
| 5/2/2008 | Specific Conductivity | 1,700 µmho/cm | 200 µmho/cm (proposed) | Area A (Composite) |
| 5/2/2008 | Iron | 1.3 mg/L | 1.0 mg/L | Area A (Composite) |
| 2/19/2008 | Total Suspended Solids | 410 mg/L | 100 mg/L | WCL-11G |
| 2/19/2008 | Specific Conductivity | 3,300 µmho/cm | 200 µmho/cm (proposed) | WCL-11G |

---

[2] The source of this data is from both RSS' and WCL's Annual Reports to the Regional Board, which both contain laboratory sampling results that contain data for outfalls from both facilities. The data in this table includes all the troublesome discharges not included in the table above in Section II(A), however, it is unclear whether some of these discharge actually pertain to the RSS facility. In addition, the Regional Board does not have a 2006-2007 Annual Report on file for WCL; the data here is from the 2006-2007 RSS Annual Report. To the extent WCL failed to file an annual report for the 2006-2007 rainy season by July 1, 2007, then WCL is in violation of Section B(14) of the General Permit, requiring the submission of an annual report by July 1st for the previous rainy season.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 11 of 17

| 2/19/2008 | Iron | 33 mg/L | 1.0 mg/L | WCL-11G |
|---|---|---|---|---|
| 2/19/2008 | Specific Conductivity | 1,500 µmho/cm | 200 µmho/cm (proposed) | WCL-C |
| 1/3/2008 | Total Suspended Solids | 2,100 mg/L | 100 mg/L | WCL-8 |
| 1/3/2008 | Specific Conductivity | 1600 µmho/cm | 200 µmho/cm (proposed) | WCL-8 |
| 1/3/2008 | Iron | 110 mg/L | 1.0 mg/L | WCL-8 |
| 3/26/2007 | Specific Conductivity | 580 µmho/cm | 200 µmho/cm (proposed) | WCL-9 |
| 3/26/2007 | Iron | 1.3 mg/L | 1.0 mg/L | WCL-9 |
| 12/21/2006 | Total Suspended Solids | 160 mg/L | 100 mg/L | IRRF-1 |
| 12/21/2006 | Specific Conductivity | 260 µmho/cm | 200 µmho/cm (proposed) | IRRF-1 |
| 12/21/2006 | Total Suspended Solids | 140 mg/L | 100 mg/L | IRRF-5 |
| 12/21/2006 | Total Suspended Solids | 48,000 mg/L | 100 mg/L | WCL-8 |
| 12/21/2006 | Specific Conductivity | 2,300 µmho/cm | 200 µmho/cm (proposed) | WCL-8 |
| 12/21/2006 | Iron | 350 mg/L | 1.0 mg/L | WCL-8 |
| 12/21/2006 | Total Suspended Solids | 8,200 mg/L | 100 mg/L | WCL-9 |
| 12/21/2006 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | WCL-9 |
| 12/21/2006 | Iron | 26 mg/L | 1.0 mg/L | WCL-9 |
| 3/30/2006 | Specific Conductivity | 1,100 µmho/cm | 200 µmho/cm (proposed) | WCL-C (Retention basin – Near new transfer station) |
| 3/30/2006 | Iron | 1.5 mg/L | 1.0 mg/L | WCL-C (Retention basin – Near new transfer station) |
| 3/23/2006 | Total Suspended Solids | 330 mg/L | 100 mg/L | WCL-9 |
| 3/23/2006 | Specific Conductivity | 680 µmho/cm | 200 µmho/cm (proposed) | WCL-9 |
| 3/23/2006 | Iron | 14 mg/L | 1.0 mg/L | WCL-9 |
| 3/20/2006 | Total Suspended Solids | 4,200 mg/L | 100 mg/L | WCL-7 (Public Disposal Pad) – Runoff from paved public disposal area |
| 3/20/2006 | Specific Conductivity | 1,300 µmho/cm | 200 µmho/cm (proposed) | WCL-7 (Public Disposal Pad) – Runoff from paved public |

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 12 of 17

| | | | | |
|---|---|---|---|---|
| | | | | disposal area |
| 3/20/2006 | Iron | 40 mg/L | 1.0 mg/L | WCL-7 (Public Disposal Pad) – Runoff from paved public disposal area |
| 3/20/2006 | Total Suspended Solids | 580 mg/L | 100 mg/L | WCL-8 (Runoff along side of main road) |
| 3/20/2006 | Specific Conductivity | 930 µmho/cm | 200 µmho/cm (proposed) | WCL-8 (Runoff along side of main road) |
| 3/20/2006 | Iron | 19 mg/L | 1.0 mg/L | WCL-8 (Runoff along side of main road) |
| 3/20/2006 | Total Suspended Solids | 260 mg/L | 100 mg/L | WCL-9 (Runoff from Bay Environmental Power (NOVE)) |
| 3/20/2006 | Specific Conductivity | 730 µmho/cm | 200 µmho/cm (proposed) | WCL-9 (Runoff from Bay Environmental Power (NOVE)) |
| 3/20/2006 | Iron | 14 mg/L | 1.0 mg/L | WCL-9 (Runoff from Bay Environmental Power (NOVE)) |
| 2/14/2005 | Total Suspended Solids | 3,700 mg/L | 100 mg/L | WCL-7 ((New) Runoff from paved public disposal area) |
| 2/14/2005 | Specific Conductivity | 2,900 µmho/cm | 200 µmho/cm (proposed) | WCL-7 ((New) Runoff from paved public disposal area) |
| 2/14/2005 | Total Organic Carbon | 270 mg/L | 110 mg/L | WCL-7 ((New) Runoff from paved public disposal area) |
| 2/14/2005 | Iron | 57 mg/L | 1.0 mg/L | WCL-7 ((New) Runoff from paved public disposal area) |

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 13 of 17

| 2/14/2005 | Total Suspended Solids | 1,100 mg/L | 100 mg/L | WCL-8 (Runoff from side of main road) |
| 2/14/2005 | Specific Conductivity | 2,900 µmho/cm | 200 µmho/cm (proposed) | WCL-8 (Runoff from side of main road) |
| 2/14/2005 | Iron | 10 mg/L | 1.0 mg/L | WCL-8 (Runoff from side of main road) |
| 2/14/2005 | Total Suspended Solids | 260 mg/L | 100 mg/L | WCL-9 (Runoff from NOVE) |
| 2/14/2005 | Specific Conductivity | 730 µmho/cm | 200 µmho/cm (proposed) | WCL-9 (Runoff from NOVE) |
| 2/14/2005 | Iron | 7.5 mg/L | 1.0 mg/L | WCL-9 (Runoff from NOVE) |
| 2/14/2005 | Specific Conductivity | 250 µmho/cm | 200 µmho/cm (proposed) | INNF-1 |
| 1/4/2005 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | WCL-3 (Retention Basin) |

CSPA's investigation, including its review of WCL's analytical results documenting pollutant levels in WCL's storm water discharges well in excess of applicable water quality standards, EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that WCL has not implemented BAT and BCT for its discharges of TSS, specific conductivity, total organic carbon, iron, and other pollutants in violation of Effluent Limitation B(3) of the General Permit.  WCL was required to have implemented BAT and BCT by no later than October 1, 1992.  Thus, WCL is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.  In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since December 11, 2003, and that will occur at WCL subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that WCL has discharged storm water containing impermissible levels of TSS, specific conductivity, total organic carbon, and iron in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from WCL are ongoing.  Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act.  Consistent with the five-year statute of limitations applicable to

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 14 of 17

citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act since December 11, 2003.

### B. Failure to Sample, Analyze, and Inspect Storm Events and Mandatory Parameters

WCL has reported different amounts of storm water discharge locations in its Annual Reports. In the 2007-2008 Annual Report, it indicated that it has eleven storm water discharge locations. In earlier reports, it indicated that it has seven. However, WCL has never sampled discharges from seven distinct storm water discharge locations in its Annual Reports from the past five years, nor has it given any explanation for its failure to do so. WCL has failed to collect all of the two required storm water samples from each storm water discharge location in each of the last five years despite discharging storm water from its facility. WCL failed to take the requisite samples when storm water discharges from the Facility did not occur within the first hour of a storm event. For each of the five previous rainy seasons[3], with the exception of the 2007-2008 rainy season, WCL failed to reasonably explain in its annual reports why it was unable to collect one or both of the required two storm water samples from each of its outfalls. Each of these failures to collect requisite storm water samples is a violation of the General Permit, Section B(5).

Facilities within SIC Code 4953, including WCL, must analyze each of its storm water samples for iron. General Permit, Table D (Sector N). CSPA's review of WCL's monitoring data indicates that WCL has failed to analyze for iron in every storm water sample taken at WCL during the past five years for the outfalls IRRF-1, IRRF-5, and IRC (TS)-1, and has not provided a sufficient explanation for its failure to do so in each of the past five years. Each failure to analyze for a specific required parameter is a violation of General Permit, Section B(5)(c)(iii). Five years times three outfalls times two samples per year adds up to 30 distinct violations of the General Permit.

WCL failed to provide explanations for its failures to conduct monthly wet season visual observations for October, November, December, January, February, April, and May during the 2005-2006 rainy season; and for October, November, December, January, March, April, and May during the 2004-2005 rainy season. Each of these failures to conduct monthly wet season visual observations is a violation of the General Permit, Section B(4).

The above listed violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act since December 11, 2003.

---

[3] As noted above, CSPA has not reviewed the 2006-2007 Annual Report for WCL because it is not on file with the regional board. Based on its review of WCL's other annual reports and based on information and belief, CSPA alleges that WCL did not sample two storm events from each storm water discharge location during the 2006-2007 rainy season.

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 15 of 17

### C. Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.

The SWPPP requirements are described in Section II(C) above. CSPA's investigation of the conditions at WCL as well as WCL's Annual Reports indicate that WCL has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. In addition, CSPA's review of WCL's SWPPP and Storm Water Monitoring Plan ("SWMP") attached to its 2005-2006 Annual Report shows that the SWPPP and SWMP were very inadequate at that time. For example, the SWPPP lacks a sufficient narrative describing potential pollutant sources and an associated narrative describing the storm water best management practices designed to treat those pollutant sources. There is also no site map attached.

Thus, CSPA alleges that WCL has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. WCL has been in continuous violation of Section A and Provision E(2) of the General Permit every day since December 11, 2003 at the very latest, and will continue to be in violation every day that WCL fails to prepare, implement, review, and update an effective SWPPP. Republic Services is subject to penalties for violations of the Order and the Act occurring since December 11, 2003.

### D. Failure to Develop and Implement an Adequate Monitoring and Reporting Program

The above referenced data was obtained from the WCL's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that WCL has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by WCL is not representative of the quality of the WCL's various storm water discharges or WCL failed to monitor all qualifying storm water discharges, CSPA, on information and belief, alleges that WCL's monitoring program violates Sections B(3), (4), and (7) of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Republic Services is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since December 11, 2003.

### E. Failure to File True and Correct Annual Reports.

For the last five years, WCL and its agents, C. David Zeiger and Michael Boyle, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, WCL has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time WCL failed to submit a complete or correct report and every time WCL or its agents falsely purported to comply with the Act. Republic Services is subject to penalties for violations of Section (C) of the General Industrial

O'Connor, Cordesman, Zeiger, Boyle, Jenkins, Carvalho, and Howard
Richmond Sanitary Service & West County Landfill
December 11, 2008
Page 16 of 17

Storm Water Permit and the Act occurring since December 11, 2003.

**IV.    Persons Responsible for the Violations.**

CSPA puts Republic Services, Inc., Richmond Sanitary Service, Inc., West County Landfill, Inc., James E. O'Connor, Michael Cordesman, C. David Zeiger, Michael Boyle, and Peter Jenkins on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Republic Services, Inc., Richmond Sanitary Service, Inc., West County Landfill, Inc., James E. O'Connor, Michael Cordesman, C. David Zeiger, Michael Boyle, and Peter Jenkins on notice that it intends to include those persons in this action.

**V.    Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

**VI.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

| | |
|---|---|
| Michael R. Lozeau | Andrew L. Packard |
| Douglas J. Chermak | Law Offices of Andrew L. Packard |
| LOZEAU DRURY LLP | 319 Pleasant Street |
| 1516 Oak Street, Suite 216 | Petaluma, California 94952 |
| Alameda, California 94501 | Tel. (707) 763-7227 |
| Tel. (510) 749-9102 | andrew@packardlawoffices.com |
| michael@lozeaudrury.com | |

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Republic Services to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such

other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Republic Services and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance


cc:     CT Corporation, Agent of Service of Process for Richmond Sanitary Service, Inc.
        (C1511627), Republic Services, Inc. (C2267166), and West County Landfill, Inc.
        (C1511323)

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Michael Mukasey, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**

Rain Dates, RSS and WCL, Richmond, California

| | | |
|---|---|---|
| November 30, 2003 | May 5, 2004 | November 27, 2004 |
| December 1, 2003 | May 6, 2004 | December 8, 2004 |
| December 2, 2003 | May 7, 2004 | December 28, 2004 |
| December 4, 2003 | May 9, 2004 | December 29, 2004 |
| December 5, 2003 | May 12, 2004 | December 30, 2004 |
| December 6, 2003 | May 13, 2004 | December 31, 2004 |
| December 7, 2003 | May 14, 2004 | January 1, 2005 |
| December 9, 2003 | May 15, 2004 | January 2, 2005 |
| December 11, 2003 | May 16, 2004 | January 3, 2005 |
| December 11, 2003 | May 18, 2004 | January 5, 2005 |
| December 13, 2003 | May 20, 2004 | January 7, 2005 |
| December 14, 2003 | May 21, 2004 | January 8, 2005 |
| December 19, 2003 | May 23, 2004 | January 9, 2005 |
| December 20, 2003 | May 24, 2004 | January 10, 2005 |
| December 21, 2003 | May 25, 2004 | January 11, 2005 |
| December 23, 2003 | May 26, 2004 | January 12, 2005 |
| December 24, 2003 | May 27, 2004 | January 25, 2005 |
| December 25, 2003 | May 28, 2004 | January 27, 2005 |
| December 29, 2003 | May 29, 2004 | January 28, 2005 |
| December 30, 2003 | May 30, 2004 | February 14, 2005 |
| January 1, 2004 | May 31, 2004 | February 15, 2005 |
| January 2, 2004 | October 1, 2004 | February 16, 2005 |
| January 7, 2004 | October 5, 2004 | February 18, 2005 |
| January 9, 2004 | October 7, 2004 | February 19, 2005 |
| January 24, 2004 | October 9, 2004 | February 20, 2005 |
| January 27, 2004 | October 10, 2004 | February 21, 2005 |
| January 30, 2004 | October 11, 2004 | February 22, 2005 |
| February 1, 2004 | October 12, 2004 | February 27, 2005 |
| February 2, 2004 | October 14, 2004 | February 28, 2005 |
| February 3, 2004 | October 15, 2004 | March 2, 2005 |
| February 7, 2004 | October 16, 2004 | March 4, 2005 |
| February 13, 2004 | October 17, 2004 | March 11, 2005 |
| February 16, 2004 | October 19, 2004 | March 18, 2005 |
| February 17, 2004 | October 20, 2004 | March 19, 2005 |
| February 18, 2004 | October 21, 2004 | March 20, 2005 |
| February 22, 2004 | October 22, 2004 | March 21, 2005 |
| February 25, 2004 | October 23, 2004 | March 22, 2005 |
| February 26, 2004 | October 24, 2004 | March 23, 2005 |
| February 27, 2004 | October 25, 2004 | March 27, 2005 |
| March 1, 2004 | October 26, 2004 | March 28, 2005 |
| March 25, 2004 | October 27, 2004 | March 29, 2005 |
| March 26, 2004 | October 28, 2004 | April 4, 2005 |
| March 27, 2004 | October 29, 2004 | April 7, 2005 |
| April 18, 2004 | October 30, 2004 | April 8, 2005 |
| April 19, 2004 | October 31, 2004 | April 9, 2005 |
| April 20, 2004 | November 3, 2004 | April 23, 2005 |
| May 1, 2004 | November 10, 2004 | April 25, 2005 |
| May 3, 2004 | November 11, 2004 | April 26, 2005 |
| May 4, 2004 | November 13, 2004 | April 27, 2005 |

**ATTACHMENT A**
Rain Dates, RSS and WCL, Richmond, California

| | | |
|---|---|---|
| April 28, 2005 | January 9, 2006 | March 27, 2006 |
| May 4, 2005 | January 10, 2006 | March 28, 2006 |
| May 5, 2005 | January 11, 2006 | March 29, 2006 |
| May 6, 2005 | January 12, 2006 | March 31, 2006 |
| May 8, 2005 | January 13, 2006 | April 1, 2006 |
| May 9, 2005 | January 14, 2006 | April 2, 2006 |
| May 11, 2005 | January 15, 2006 | April 3, 2006 |
| May 18, 2005 | January 16, 2006 | April 4, 2006 |
| May 19, 2005 | January 17, 2006 | April 5, 2006 |
| June 9, 2005 | January 18, 2006 | April 7, 2006 |
| June 15, 2005 | January 19, 2006 | April 8, 2006 |
| June 16, 2005 | January 20, 2006 | April 9, 2006 |
| June 17, 2005 | January 21, 2006 | April 10, 2006 |
| June 18, 2005 | January 22, 2006 | April 11, 2006 |
| June 19, 2005 | January 23, 2006 | April 12, 2006 |
| August 13, 2005 | January 24, 2006 | April 13, 2006 |
| August 15, 2005 | January 25, 2006 | April 14, 2006 |
| August 18, 2005 | January 26, 2006 | April 15, 2006 |
| August 19, 2005 | January 27, 2006 | April 16, 2006 |
| August 20, 2005 | January 28, 2006 | April 17, 2006 |
| August 30, 2005 | January 29, 2006 | May 19, 2006 |
| September 19, 2005 | January 30, 2006 | May 20, 2006 |
| September 20, 2005 | January 31, 2006 | May 21, 2006 |
| September 21, 2005 | February 1, 2006 | October 5, 2006 |
| October 15, 2005 | February 2, 2006 | November 2, 2006 |
| October 24, 2005 | February 3, 2006 | November 3, 2006 |
| October 26, 2005 | February 4, 2006 | November 9, 2006 |
| October 28, 2005 | February 17, 2006 | November 10, 2006 |
| October 29, 2005 | February 18, 2006 | November 11, 2006 |
| October 30, 2005 | February 19, 2006 | November 13, 2006 |
| November 4, 2005 | February 26, 2006 | November 14, 2006 |
| November 7, 2005 | March 2, 2006 | November 26, 2006 |
| November 8, 2005 | March 3, 2006 | November 27, 2006 |
| November 9, 2005 | March 4, 2006 | December 9, 2006 |
| November 28, 2005 | March 5, 2006 | December 11, 2006 |
| December 1, 2005 | March 6, 2006 | December 12, 2006 |
| December 2, 2005 | March 7, 2006 | December 13, 2006 |
| December 17, 2005 | March 8, 2006 | December 14, 2006 |
| December 18, 2005 | March 10, 2006 | December 15, 2006 |
| December 25, 2005 | March 11, 2006 | December 21, 2006 |
| December 30, 2005 | March 12, 2006 | December 23, 2006 |
| December 31, 2005 | March 13, 2006 | December 24, 2006 |
| January 1, 2006 | March 14, 2006 | December 25, 2006 |
| January 2, 2006 | March 15, 2006 | December 26, 2006 |
| January 3, 2006 | March 16, 2006 | December 27, 2006 |
| January 4, 2006 | March 17, 2006 | January 4, 2007 |
| January 5, 2006 | March 20, 2006 | January 17, 2007 |
| January 6, 2006 | March 21, 2006 | January 26, 2007 |
| January 7, 2006 | March 24, 2006 | January 27, 2007 |
| January 8, 2006 | March 25, 2006 | February 7, 2007 |

Notice of Violations and Intent to File Suit

**ATTACHMENT A**
Rain Dates, RSS and WCL, Richmond, California

| | | |
|---|---|---|
| February 8, 2007 | December 28, 2007 | April 23, 2008 |
| February 9, 2007 | December 29, 2007 | October 5, 2008 |
| February 10, 2007 | December 30, 2007 | October 7, 2008 |
| February 11, 2007 | January 3, 2008 | October 9, 2008 |
| February 12, 2007 | January 4, 2008 | October 14, 2008 |
| February 13, 2007 | January 5, 2008 | October 15, 2008 |
| February 25, 2007 | January 6, 2008 | October 16, 2008 |
| February 26, 2007 | January 7, 2008 | October 17, 2008 |
| February 27, 2007 | January 8, 2008 | October 19, 2008 |
| February 28, 2007 | January 9, 2008 | October 20, 2008 |
| March 20, 2007 | January 10, 2008 | October 21, 2008 |
| March 26, 2007 | January 21, 2008 | October 22, 2008 |
| April 1, 2007 | January 22, 2008 | October 23, 2008 |
| April 4, 2007 | January 23, 2008 | October 24, 2008 |
| April 11, 2007 | January 24, 2008 | October 25, 2008 |
| April 14, 2007 | January 25, 2008 | October 26, 2008 |
| April 16, 2007 | January 26, 2008 | October 27, 2008 |
| April 20, 2007 | January 27, 2008 | October 28, 2008 |
| April 22, 2007 | January 28, 2008 | October 29, 2008 |
| May 4, 2007 | January 29, 2008 | October 30, 2008 |
| September 22, 2007 | January 30, 2008 | October 31, 2008 |
| October 12, 2007 | January 31, 2008 | November 1, 2008 |
| October 14, 2007 | February 1, 2008 | November 2, 2008 |
| October 15, 2007 | February 2, 2008 | November 3, 2008 |
| October 16, 2007 | February 3, 2008 | November 4, 2008 |
| October 17, 2007 | February 19, 2008 | November 5, 2008 |
| November 10, 2007 | February 20, 2008 | November 6, 2008 |
| November 11, 2007 | February 21, 2008 | November 7, 2008 |
| November 19, 2007 | February 22, 2008 | November 8, 2008 |
| December 4, 2007 | February 23, 2008 | November 9, 2008 |
| December 6, 2007 | February 24, 2008 | November 10, 2008 |
| December 7, 2007 | March 12, 2008 | November 11, 2008 |
| December 17, 2007 | March 13, 2008 | November 26, 2008 |
| December 18, 2007 | March 14, 2008 | |
| December 20, 2007 | March 15, 2008 | |

Notice of Violations and Intent to File Suit